UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

STEVEN S. BELL                        CIVIL ACTION NO. 05-0779

VERSUS
                                      DISTRICT JUDGE ROBERT G. JAMES

THE PRUDENTIAL INSURANCE
     COMPANY OF AMERICA              U.S. MAGISTRATE JUDGE JAMES D. KIRK

**REPORT AND RECOMMENDATION**

This Employees Retirement Income Security Act ("ERISA") case, 29 U.S.C.1001 et seq., is referred to me by the district judge for Report and Recommendation. The case is ready for decision on briefs on the merits in accordance with the ERISA Case Order [Doc. #27].

**Facts**

Claimant, Steven S. Bell (Bell), born March 2, 1947 and who was 56 years old when he left his employment, was employed at Graphic Packaging International, Inc., now Riverwood International Corp.(Riverwood), for 29 years. Bell's job was a paper machine refiner operator. As such, he operated a battery of machines to refine pulp used in the papermaking process and had to lift up to 50 pounds occasionally. He also was required to stand, walk, and climb ladders and frequently use arm and leg controls. The job

required that he have the ability to read, and write, and have vision, hearing, speech, and agility. [PRU-BELL 0309]. Bell received a non-work related injury on September 25, 2001 when his pickup truck which he was driving was broadsided on the drivers side and he believes he hit his head on the side or window.

Bell never returned to work and filed an application for benefits under a Long Term Disability Plan (Plan) offered by his employer and insured by Prudential Insurance Company of America, Inc. (Prudential) who also serves as the Plan administrator. The Attending Physician's Statement by Dr. Gary Jones [PRU-BELL 0225] lists "brainstem injury" as the diagnosis with "chronic dizziness & weakness in extremities preventing most physical activity". Benefits were denied on June 4, 2002, Prudential finding no objective medical evidence of a disability. The first reconsideration or appeal was denied on January 21, 2003, following internal review of the medical records by Dr. Jill Fallon, again finding no objective medical evidence to support disability. A second request for reconsideration was also denied for that reason and, on July 8, 2003, following an additional medical records review by a physician-consultant (Dr. Strasnick), his request for benefits was denied a third time. The reason, once again, was the lack of objective medical evidence. This suit was filed in state court on March 28, 2005 and was timely removed to this court.

On May 2, 2003 Bell was found to be permanently and totally disabled by the Veterans' Administration. On November 17, 2003, the Social Security Administration found Bell to be disabled as of December 1, 2002 and entitled to benefits.

### Standard of Review

In accordance with this court's standing ERISA Case Order, the parties agree that the Group Long Term Disability Plan issued by defendant, Prudential, to Riverwood is an employee welfare benefit plan, as defined by the provisions of ERISA, and that this case is governed by ERISA and that all state law claims are preempted. The parties also agree that the Plan provides the administrator with discretionary authority to interpret the provisions of the Plan and to make findings of fact and determine eligibility for benefits. Both Claimant and Defendant agree that the administrative record is complete. However, because the administrator is both insurer and administrator and is thus conflicted, the court will give a modicum less deference to the administrator's decision. <u>Vega v. National Life Insurance Services, Inc.</u>, 188 F.3d 287, 299 (5th Cir. 1999).

### The Plan

The Long Term Disability Plan provides, in pertinent part:

You are disabled when Prudential determines that:

-you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury,** and

> -you have a 20% or more loss in your **indexed monthly earnings** due to that sickness or injury.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

### The Medical Records

The record reveals that Bell presented initially to Dr. Jones the day after the accident, September 26, 2001, reporting he had bumped his head and complaining of neck, shoulder, leg and abdominal pain and dizziness and shortness of breath. Dr. Jones took Bell off work and ordered a CT[1] scan of his brain. His diagnosis was concussion. The CT of the brain was normal.

The next day Bell complained to Dr. Jones of dizziness, severe headaches and nausea. He was given an injection and prescribed Phenergan[2] and kept off work two weeks. On October 2, 2001, Bell reported that he was still dizzy, was "blinking a lot", his vison was "off", his thought processes were slow and he had neck

---

[1] CT scan, or computed tomography, is a diagnostic proceedure that uses special x-ray equipment to obtain cross-sectional pictures of the body. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[2] Phenergan (Promethazine) is used to relieve the symptoms of allergic reactions, as a sedative, to control upset stomach and to relieve pain after surgery and to prevent and treat motion sickness. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

stiffness. He was prescribed Neurontin[3] and Remeron[4]. A week later, Bell told Dr. Jones that his vision was impaired, he was still dizzy, was unsteady. Dr. Jones maintained the diagnosis of concussion and continued Bell off work to October 22nd.

On October 17th plaintiff's complaints to Dr. Jones were essentially the same. Medications at that time were Neurontin and Trazodone[5]. Bell was continued off work. On October 8th, Dr. Jones ordered an MRI[6].

On November 12, 2001, Bell presented to Dr. Boykin with a history of multiple head injuries. Boykin recommended he be seen by a neurosurgeon[7] and recommended an MRI of the brain. The MRI was performed on November 13, 2001 and was negative (except for showing a sinus cyst or polyp). On November 29, 2001, Bell was seen again by Dr. Jones still complaining of dizziness, nausea and difficulty reading and headaches. the diagnosis at that time was multiple concussions, dizziness and "memory problems". Bell was continued

---

[3] Neurontin (Gabapentin) is used to help control seizures by controlling abnormal excitement in the brain. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[4] Remeron (Mirtazapine) is an antidepressant, or mood elevator. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[5] Trazodone is used to treat depression. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[6] An MRI, or magnetic resonance imaging test, is a test that produces very clear pictures, or images, of the human body without the use of x-rays. MRI uses a large magnet, radio waves, and a computer to produce these images. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[7] A neurosurgeon is a surgeon who specializes in surgery of the nervous structures. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

off work. On December 20, 2001 Bell voiced the same complaints. Medications then included Trazodone and Zantac[8].

Bell saw Dr Nanda, a neurosurgeon on January 11, 2002 who believed that Bell suffered from a post concussion syndrome which did not require intervention. If the vertigo (dizziness) continued, however, Dr. Nanda recommended Bell see an ENT[9] physician. On January 21, 2002, Dr. Jones took Bell off work to February 26, 2002. Jones saw Bell again on January 24, 2002. At that time, plaintiff reported falling because of the vertigo. By then Bell had also seen an ENT, Dr. Norris, on January 18th. Norris' diagnosis was vertigo and he prescribed additional medications and recommended an ENG[10] study. The ENG was performed on January 24th and was normal. Dr. Norris' diagnosis changed to "vertigo vs. concussion" and he referred Bell back to Dr. Jones.

On February 4th Bell saw Dr. Boykin again who diagnosed concussion, discontinued the Trazodone and Neurontin and added

---

[8] Zantac (Ranitidine) is used to treat ulcers, acid reflux syndrome, acid indigestion and heartburn. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[9] An Otolaryngologist, or Otorhinolaryngologist or physician specializing in the treatment of the ears, nose and throat, commonly called, for reasons apparent, an ENT. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[10] ENG study, or electronystagmography, is a battery of eye-movement tests that look for signs of vestibular dysfunction or neurological problems by measuring nystagmus (a kind of involuntary eye movement) and record other eye movements in order to evaluate certain brain functions. ENG tests are probably the most common ones administered to people with dizziness, vertigo, and/or balance disorders. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

Celebrex[11]. Bell continued to treat with Dr. Jones who continued plaintiff off work. When Jones saw plaintiff on March 26, 2002, he reported he was no better than the day of the accident and was getting worse. Bell's diagnosis and work status remained unchanged.

On April 23, 2002, plaintiff reported having fallen again, this time twisting his ankle. Bell was continued off work to May 23, 2002. In May, Bell was seen by a specialist, Dr. Sarama, for his shortness of breath. Bell continued off work on Dr. Jones' instructions to June 25th and on that day presented with the same complaints; the diagnosis was the same. Bell was then taken off work to August 27, 2002.

On August 2nd, Bell was seen by Dr. Jaffe, for a neurological consultation. Jaffe found that Bell had suffered a closed head injury but was not sure it was a concussion since it remained unknown whether Bell had lost consciousness or not. Jaffe reported that he could not find any "objective neurological signs at this point." He recommended an EEG and "formal neuropsychological testing via a psychologist who deals with post-traumatic brain syndrome".

On September 13, 2002, Dr. Jones completed a questionnaire opining that Bell was totally disabled from performing his own

---

[11] Celebrex (Celecoxib) is a non-steroidal antiinflammatory drug (NSAID) used to relieve pain, tenderness and swelling, particularly in the joints. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

occupation and any occupation due to his dizziness and memory loss. Bell remained off work per doctor's orders.

Bell saw Dr. House, a specialist in otology[12] and neurotology[13] on January 27, 2003. Dr. House wrote to Bell that "I suspect your dizziness, tinnitus and many other problems are related to brainstem contusion with your accident. This usually improves over time. However, it is unlikely to see any great improvement after 18 months."

On February 25th, Dr. Jones wrote a letter stating that Bell "suffers from constant dizziness, tinnitus and weakness believed to be due to a brainstem contusion. I had hoped that these symptoms would improve with time but they have not. There is very little that can be done to treat this. I do not believe Mr. Bell will be able to return to his previous job."

Pursuant to Bell's third appeal, Prudential referred the case to Dr. Barry Strasnick in the Department of Otolaryngology[14] at the Eastern Virginia Medical School who rendered a report from his review of the medical records on June 30, 2003. Dr. Strasnick provided a concise and accurate summary of the medical history and noted that plaintiff's job description requires that he operate a

---

[12] Otology is a science that deals with the ear and its diseases. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[13] Neurotology is the neurological study of the ear. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[14] Otolaryngology is a medical specialty concerning the ear, nose and throat. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

battery of machines with typical lifting of 20 to 50 pounds and no climbing, stooping or maintaining of balance for extended periods of time. Dr. Strasnick concluded that there was no objective medical evidence in the records he reviewed (which, from his summary, appear to be all of the records available at the time) to support plaintiff's claim of disability. However, Dr. Strasnick did note that post-traumatic brain injury is "often times with subjective symptomatology in the absence of objective findings." He further noted, though, that Bell's complaints of confusion and memory problems had not been substantiated by neuro-psychological testing as had been recommended by Dr. Jaffe. Dr. Strasnick concluded that although Bell might well benefit from continued medical management, "the medical documentation provided does not support that an impairment from a head injury prevents him from performing the occupation described."

Finally, after Prudential's denial of Bell's third and final appeal, his attorney obtained and forwarded to Prudential the disability determination by the Social Security Administration and a report from an Otolaryngologist in Little Rock, Dr. John Dickens. Bell, through counsel, requested an additional review of the case by Prudential, even though his appeal rights at that time were, according to Prudential's rules, technically exhausted.

Dr. Dickens reviewed the medical records for Boston Old Colony Insurance Company (apparently another disability insurance

9

provider) and determined that plaintiff suffers from a "severe, central vestibular loss, most likely brain stem contusion" and concluded that Bell is permanently unemployable, that is, "totally and completely disabled". Prudential agreed to review the records despite the fact that plaintiff's three appeals had been exhausted [PRU-BELL 0128][15] but found the records did not change its decision and, once again, denied benefits. Prudential wrote, in denying benefits:

> "Although the decision to deny Mr. Bell's claim was upheld by the Appeals Committee, we have considered your letter and the documentation submitted. The information you submitted from Dr. Dickins (sic) does not change our assessment of Mr. Bell's eligibility for benefits as of March 25, 2002.[16] A later period of disability would not be covered under this policy as Mr. Bell was no longer active at work for Graphic Packaging International. Therefore, we maintain that our previous decision to deny Mr. Bell's LTD claim was appropriate." [Footnote added] [PRU-BELL 0128]

### Review for Abuse of Discretion

Bell does not contest the administrator's interpretation of the Plan. See Wildbur v. ARCO Chem. Co., 974 F.2d 631 (5th Cir. 1992). Rather, claimant, through counsel, argues that there does not exist in the record substantial evidence to support the decision of the administrator.

---

[15] Such consideration was required by this Circuit's precedent. Vega v. Nat'l Life Ins. Servs., 188 F.3d 287, 299 (5th Cir. 1999).

[16] The date of eligibility following the 6 month elimination period specified by the Plan [PRU-BELL 0013].

Eligibility for benefits under any ERISA plan is governed by the plain meaning of the plan language. Threadgill v. Prudential Securities Group, Inc., 145 F.3d 286 (5th Cir. 1998). In determining whether an administrator abused its discretion, we look to whether that administrator was arbitrary or capricious. "An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial." Lain v. UNUM Life Ins. Co. of America, 279 F.3d 337, 342 (5th Cir. 2002). There must be "concrete evidence" in the administrative record that supports the denial of the claim. Id. The administrator's decision should be reversed only if it is arbitrary or capricious, that is, if the record lacks substantial evidence to support the Plan Administrator's benefit determination. See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 215 (5th Cir. 1999). See also Vega v. Nat'l Life Ins. Servs., 188 F.3d 287, 299 (5th Cir. 1999).

The initial denial and the three denials of reconsideration or appeal by Prudential were all expressly based on the lack of objective medical evidence to support a finding of disability. Such a basis for a disability determination may constitute "substantial evidence" or "concrete evidence". See Mouton v. Fresenius Medical Care of North, 2003 WL 22287522 (5th Cir. 2003), Dubose v. Prudential, 2003 WL 23021934 (5th Cir. 2003)(unpublished), Chandler v. Hartford, 2006 WL 1209363 (5th Cir. 2006)(unpublished),Ruiz v.

11

Continental Casualty Co., 400 F.3d 986 (7th Cir. 2005), Johnson v. Metropolitan, 437 F.3d 809 (8th Cir. 2006), Wangenstein v. Equifax, Inc., 2006 WL 2220822 (11th Cir. 2006)(unpublished). That determination--that there was simply no objective medical evidence supporting Bell's claim--is correct and supported a finding of no disability. All of the medical records up to that time simply chronicled the subjective complaints reported by Bell. All of the test results including the MRI, the CT, the ENG and the lab results and other tests were negative. The plaintiff had never undergone the two tests which had been recommended by Dr. Jaffe and which could have substantiated his claimed problems with objective evidence: the neuro-psychological test and the EEG.

    However, Dr. Dickens' report, properly presented to the administrator for consideration, Vega, supra, changed things in that, for the first time, objective medical evidence (audiometric testing and an ENG) supported a finding of disability.  Prudential rejected that evidence outright, presumably concluding that it was applicable only to the time of Dr. Dickens' examination and report, April of 2004. Therefore, the administrator did not factor the doctor's opinions or test results into the evidence before it. Dickens' report though recites that he reviewed the records of Dr. House, Dr. Jones, Dr. Jaffe and others. He states that "I believe this gentleman has had excellent medical care and has been totally evaluated and my evaluation only serves to confirm what has been

felt all along." This is an indication at least, that his conclusions are applicable to plaintiff's complaints from the beginning.

At the very most, the report is arguably ambiguous as to the date when disability began. But to suggest that test results after repeated testing and evaluation over the course of two and a half years cannot be considered because relevant only to the period of time when the test is done is not a logical conclusion. That would mean that any medical test or conclusion after the date of an event could not be considered as relevant to the date of the event. In short, Dr. Dickens' report should not have been summarily rejected by a non-physician at Prudential. Instead, Dr. Dickens' opinions and the results of his objective testing should have been presented to Prudential's medical specialists for review as was the other medical evidence in the case. Further, those specialists should have clarified from Dr. Dickens (or required Bell to provide clarification) as to what period of time he believes his findings, based on the test results, are applicable.

Conclusion

The medical evidence in the case shows that plaintiff has subjective complaints of dizziness and memory loss. However, the evidence also shows some objective evidence corroborating some of plaintiff's complaints and supporting his doctors' provisional diagnosis of brain stem contusion and their conclusions that

plaintiff cannot work. That evidence has not been reviewed by Prudential's medical consultants.

For the foregoing reasons, the Court finds, after reviewing the record and considering Prudential's dual role as insurer and plan administrator, that the decision of the administrator is not supported by substantial and concrete evidence and is thus arbitrary and capricious and an abuse of discretion. This case should be remanded to the administrator for review by Prudential's medical specialists of Dr. Dickens' test results and opinions and correlation of them with their prior opinions, including Dr. Strasnick's observation that often the only signs of this kind of injury are subjective complaints.  Further, those specialists should clarify from Dr. Dickens (or require Bell to provide clarification)  as to what period of time he believes his findings, based on the test results, are applicable. In addition, plaintiff may, if he wishes, submit to the administrator results of neuro-psychological testing and/or an EEG for review by Prudential's physician consultants and may submit an opinion by Dr. Dickens' comparing the ENG by Dr. Norris in August 2002 with his own. Vega, supra.

Therefore, because the basis for denial is no longer an issue[17], this is a special circumstance[18] where, in fairness to both parties, remand to the administrator is appropriate.

IT IS RECOMMENDED that this case be remanded to the administrator for further consideration as described above, that this court retain jurisdiction in the case, that the Clerk be ordered to administratively close the case, subject to reopening on timely motion of either party. The administrator should be given 150 days within which to complete its review and render a decision. Should plaintiff wish to submit additional evidence of neuro-psychological testing or EEG or supplemental opinion by Dr. Dickens, that should be done within 90 days. Either party should be allowed to move to reopen this proceeding within 180 days.

### **OBJECTIONS**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have five (5) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within five (5) days after being served with a copy thereof. A courtesy copy of any objection or response or

---

[17] The basis for denial is no longer an issue for two reasons: (1) now there is objective medical evidence supporting disability, and (2) Dr. Dickens' opinion may well apply to the relevant period of time. Roig v. Limited, 275 F.3d 45 (5th Cir. 2001); Schadler v. Anthem Life Ins. Co., 147 F.3d 388, 391 (5th Cir. 1998).

[18] Vega, 188 F.3d at 302, n.13.

request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FIVE (5) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 12th day of February, 2007.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE